IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| BRIAN J. SPINKS,<br><br>Petitioner,<br><br>vs.<br><br>ATTORNEY GENERAL FOR THE STATE OF MONTANA,<br><br>Respondent. | Cause No. CV 15-78-GF-DLC-JTJ<br><br><br>FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |

Petitioner Spinks filed this action seeking a writ of habeas corpus under 28 U.S.C. § 2254. Mr. Spinks is a state prisoner proceeding pro se.

## I.      Procedural History

The State of Montana charged Spinks with one count of violation of an order of protection on January 11, 2011, in Gallatin County, Eighteenth Judicial District. The allegation stemmed from letters that Mr. Spinks' ex-wife, Stephanie Archuleta, received from two inmates at the Crossroads Correctional Center (CCC) in Shelby where Spinks was also an inmate. The Gallatin County charges were dismissed and refiled in Toole County, where CCC is located. The State subsequently filed a notice that it intended to seek Spinks's designation as a persistent felony offender.

Spinks was represented by defense attorney, Mark Frisbie. Prior to his trial,

1

Spinks sought dismissal based upon a violation of his right to a speedy trial. *See* (Doc. 9-51 at 119-133.) The trial court denied Spinks motion. (*Id*. at 149-150.) Spinks also filed a motion and brief in support seeking to suppress evidence of prior bad acts and unfavorable character evidence referenced in investigative materials disclosed by the state. (Docs. 9-33; 9-34.) The State responded by informing Spinks that it did not intend to introduce character evidence during the trial. *See e.g.* (Docs. 9-32; 9-43 at 1-2.) Following the jury trial, Spinks was convicted and ultimately sentenced to an 18-year prison term. (Doc. 9-46 at 3.)

Spinks filed a timely direct appeal from the conviction and judgment. *State v. Spinks*, DA 12-0423, 2013 MT 248N.[1] On appeal, Spinks argued the trial court improperly admitted testimony from Archuleta from which it could be inferred that Spinks had a propensity to commit the offense and that the potential prejudice of the testimony outweighed any probative value under M. R. Evid. 403. *Id*. at ¶ 6. Spinks also contended the trial court failed to inquire into Spinks' ability to pay fees and surcharges. *Id*. The Court found that the trial court did not abuse its discretion in admitting the testimony from Archuleta because it was probative of whether or not Spinks violated the order of protection by contacting Archuleta via the other two inmates. *Id*. at ¶ 7. Further, the Court held that Spinks failed to

---

[1] All state court opinions and briefing are available at: https://supremecourtdocket.mt.gov/ (accessed December 27, 2016).

object to the trial court's imposition of the fines and surcharges. *Id.* The conviction was affirmed.

Spinks then filed a postconviction petition. *See* (Doc. 9-51). In his petition, Spinks raised the following grounds for relief: (1) a Confrontation Clause/ *Brady* violation which occurred when the State elicited testimony from Archuleta that it expressly stated it would not elicit (*Id*. at 4; 12-22; 37-39); (2) a Due Process violation by virtue of Spinks's conviction of an element of the offense which is not actually an element (*Id*. at 4; 40-42; 43-45); (3) a Due Process Violation which resulted from excessive security and unwarranted use of a shock boot at trial (*Id*. at 4; 15-16; 53-57); (4) Judicial Bias as demonstrated by lack of probable cause, allowing prejudicial testimony, refusal to give limiting instruction, mocking the defense attorney, and refusing to follow procedure (*Id*. at 5; 24-7); (5) ineffective assistance of counsel by failing to investigate, improper remarks, refusal to address issues on the record and refusal to make objections (*Id*. at 5; 60-68); (6) the State's unlawful use of a hostile witness (*Id*. at 5); (7) Prosecutorial Misconduct via unethical prosecution of case (*Id*. at 5; 25-28; 29-34; 35-36); (8) a violation of Spinks's right to speedy trial from a 389-day delay (*Id*. at 5); (9) unlawful sentence by use of inaccurate information contained in PSI (*Id*. at 5; 45-48; 49-52); (10) Due Process violation from excluding Spinks from the courtroom security hearing (*Id*. at 58-59); and (11) ineffective assistance of appellate counsel (*Id*. at 68-71).

In a written order, the trial court denied Spinks' request for postconviction relief. (Doc. 9-69). Pertinent to the issues raised in the pending petition, the court made the following determinations. In response to Spinks' contention that his due process right to a fair trial and impartial jury was violated when evidence of prior bad acts was allowed at trial, the court found that the issue was raised on direct appeal and addressed on the merits by the Montana Supreme Court. Accordingly, the claim was procedurally barred from relitigation by Spinks during postconviction proceedings. (*Id*. at 3.)

Likewise, the trial court denied Spinks' due process claim relative to the excessive security and use of a shock boot during trial. The court first determined that the claim was record based and should have been raised on direct appeal, thus, it was procedurally barred. (*Id*. at 5.) Additionally, the court determined that Spinks's claim that the restraints materially affected the course of trial was conclusory and lacking in any additional support in the record. (*Id*.) The court also observed that the constitutional nature of the claim was generally inappropriate for postconviction review and that the restraints imposed by the trial court did not implicate a fundamental miscarriage of justice. (*Id*.)

The trial court was also unmoved by Spinks' argument that trial counsel was ineffective for failing to object to the restraints or security during trial. The court observed that generally allegations based upon a failure to object are not subject to

ineffective assistance claims because the decision of whether or not to object is a tactical one based upon the attorney's judgment. (*Id*. at 8.) Further, the court found that Spinks did not establish that the security or Spinks' exclusion from the security hearing prejudicially impacted the outcome of the trial. (*Id*.)

Spinks' contention that trial counsel was ineffective for failing to file a motion for a new trial was also denied. The court determined that attorney Frisbee's decision was neither ineffective nor prejudicial. (*Id*. at 8.) The postconviction court determined that Frisbee likely believed the motion to be frivolous and that this assessment of the merits of the motion was supported when the Montana Supreme Court affirmed Spinks' conviction. (*Id*.)

Finally, the postconviction court denied Spinks's claim that Frisbee performed deficiently when he failed to adequately investigate Archuleta or impeach her following her testimony surrounding Spinks's prior threats/bad acts. First, the Court determined that Frisbee was incapable of uncovering and thus providing the defense that Spinks desired. (*Id*. at 7.) Additionally, the court again reiterated that Spinks's disagreement with the admission of the prior bad acts testimony was litigated and rejected on direct appeal. (*Id*.) Thus, Spinks was unable to establish a valid claim of ineffective assistance.[2]

---

[2] Although Spinks did not raise the precise claim of ineffective assistance of appellate counsel for failure to raise the excessive restraint security issue on direct appeal in his postconviction petition that he raises before this Court, he did attempt to raise the issue in his direct appeal from the denial of his postconviction petition with the Montana

Spinks appealed the denial of his postconviction petition. *See Spinks v. State*, DA 14-0662, 2015 MT 206N (July 21, 2015). The Court noted that the postconviction court considered all of the claims raised in Spinks' petition separately. The lower court found each ground to be either procedurally barred or insufficiently supported under the facts or law. The Montana Supreme Court found that Spinks did not request an opportunity to amend his petition and the postconviction court was not required to allow him to do so. *Id*. at ¶ 5.

Relative to Spinks' claim that his rights were violated when he was made to wear restraints during trial, the Montana Supreme Court affirmed the trial court's finding that the issue should have been raised on direct appeal. *Id*. at ¶ 6. Additionally, it noted that Spinks did not explain why the restraints were required or during which portions of the trial proceedings he wore them. *Id*. Likewise, the denial of Spinks' ineffective assistance of trial counsel and ineffective assistance of appellate counsel claims was affirmed. The lower court determined that the failure to investigate and offer impeachment evidence were raised on direct appeal and could not be re-litigated. As to the other claims, the postconviction court concluded that many of the decisions were related to reasonable tactical decisions and Spinks failed to meet his burden relating to attorney performance. The Montana Supreme Court held that postconviction court properly dismissed Spinks'

---

Supreme Court. See, *Spinks v. State*, DA 14-0662, Appellant Br. at 38- 40 (filed Feb. 13, 2015).

claims.

## II. Spinks' Claims

In his petition Spinks raises the following claims: (1) the State Violated Spinks's 5th and 14th amendment rights to due process and his 6th amendment of right to a fair trial/impartial jury by introduction of prior bad acts (Doc. 1 at 4, ¶ 13A; Doc. 1-1 at 12-13); (2) the unwarranted and excessive restraints and security violated Spinks's 5th and 14th amendment rights to due process and his 6th amendment right to a fair trial (Doc. 1 at 5, ¶ 13B; Doc. 1-1 at 14-15); (3) Spinks alleges the unwarranted and excessive restraints/security violated his 5th and 14th amendment rights to due process and his 6th amendment right to a fair trial; (4) trial counsel was ineffective for failing to object to the unwarranted restraints/security during trial and because of the restraints Spinks was unable to meaningfully participate during trial for fear of being electrocuted, depriving Spinks of a fair trial and violating his right to due process (Doc. 1-1 at 1; Doc. 1-1 at 16-17); (5) ineffective assistance of appellate counsel for failing to raise the excessive restraint/security issue on direct appeal (Doc. 1-1 at 1; Doc. 1-1 at 18-19); (6) ineffective assistance of trial counsel for failing to file a new motion following the admission of "fundamentally unfair" information from Spinks's ex-wife during trial and advising Spinks that a motion for a new trial could be filed following the conclusion of direct appeal (Doc. 1-1 at 1; Doc. 1-1 at 20-21); and,

(7) ineffective assistance of trial counsel for failure to adequately investigate or present impeachment evidence in violation of Spinks's 6th Amendment right to effective counsel (Doc. 1-1 at 2).

### III.  Analysis

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  *Lindh v. Murphy*, 521 U.S. 320, 326, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997).  This petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. at 375 n. 7 (2000).  Under Section 2254(d), a state prisoner whose claim has been "adjudicated on the merits" cannot obtain federal habeas relief unless that adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *See also Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 784 (2011) ("By its terms § 2254(d) bars relitigation of any claim

'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2).").

A state court decision is "contrary" to clearly established United States Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that is materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a result different from the Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000)).

A state court decision is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," where the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the Petitioner's case. *Williams*, 529 U.S. at 413. However, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' …and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, __ U.S. __, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678

(2010). The standard is " 'difficult to meet,'" and a "petitioner carries the burden of proof." *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011). As explained below, because Spinks cannot overcome the highly deferential standard AEDPA imposes upon this Court, deference must be afforded to the state court decisions and his claims must fail.

## 1. Claim 1- Violation of Right to a Fair Trial/Impartial Jury

As set forth above, Spinks was charged with violating an order of protection. The Permanent Order of Protection was granted on June 28, 2006, and served upon Spinks on October 2, 2006. *See* (Docs. 9-44 at 153; 9-34 at 16). The order mandated that "[Spinks] must not personally or indirectly contact, telephone, or otherwise communicate, follow, harass, intimidate, threaten, annoy or disturb the peace of [Archuleta]." *See e.g.* (Doc. 9-34 at 16).

At trial, during the direct exam of Archuleta, the following exchange occurred:

Prosecutor: Did the Defendant ever make threats towards you during your marriage?

Frisbie: Objection, character evidence.

Court: Overruled.

Prosecutor: You can answer the question.

Archuleta: Yes.

Prosecutor:  Okay.

Court:  I'll just make a ruling, it goes to the testimony, I'm presuming is going to be elicited regarding the victim's state of mind as a result of the current offense.

Prosecutor:  That's correct, Your Honor.

Court:  Okay.

Prosecutor:  What kind of threats did the Defendant make towards you during your marriage?

Archuleta:  Um, well a few times we separated and-

Frisbie:  I would like to renew my objection for character evidence, these are remote in time.

Court:  Okay, and my ruling stays the same, thank you.

Frisbie:  Thank you.

Prosecutor:  You can answer.

Archuleta:  A few times we separated and he would often make threats such as, he was going to get drug dealers to follow me, chase me down, and rape me if I didn't come back to him.

Prosecutor:  Any other threats?

Frisbie:  Your Honor, I would like to have a limiting instruction.

The Court:  You will.

Frisbie:  Thank you.

Archuleta:  Um, and other—he made another threat that he had people watching me when I was living at my aunt's house, actually. He had people watching me, and he had people with a gun

aimed at my head and I didn't know it, and he could have killed so easily and dispose of the body and pour lye on it so nobody would ever find the evidence.

Prosecutor:  Did that scare you?

Archuleta:  Yeah.

(Doc. 9-44 at 144-45).

Later in the trial, the court further explained the rationale for admitting the "character evidence" from Archuleta with which Spinks takes issue:

> The offense before the court is a violation of a protection order. The order that I'm specifically dealing with is the second amended order of protection issued June 13th of '06. The victim testified to a long history of turbulence between herself and the Defendant, and the testimony that she provided, while I'm sure Mr. Frisbie would prefer those descriptions not to be heard by the jury. I'm sure also it is a brief statement of a 10 year history between the parties. She indicated that for these reasons that she was terrified after receiving the current letters. She had that she had received threats in the past, consistent with what was occurring in this case, and consistent as well with what he—Mr. Spinks has said previously in the past.
>
> The State's case is based on indirect contact, and the statements that the victim made specifically reference prior conduct of the Defendant, wherein he indicated he would indirectly reach out and touch the victim; an I won't go through all the specific ways the victim established.

(Doc. 9-44 at 160).

The Montana Supreme Court affirmed this rationale on direct appeal holding that there was no abuse of discretion by the trial court in admitting this testimony because it was probative of whether or not Spinks violated the order of protection

by engaging in indirect contact with Archuleta via the other two inmates. *State v. Spinks*, DA 12-0423, 2013 MT 248N, ¶ 7.

State court evidentiary rulings cannot serve as a basis for habeas relief unless the asserted error rises to the level of a federal constitutional violation. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). The correctness of a state court's evidentiary ruling is irrelevant for federal habeas review, the only question is whether the ruling "rendered the trial so fundamentally unfair as to violate due process. *Larson v. Palmateer*, 515 F. 3d 1057, 1067 (9th Cir. 2008); *Windham v. Merkle*, 163 F. 3d 1092, 1103 (9th Cir. 1998). The admission of "other acts" evidence violates due process only when "there are no permissible inferences the jury may draw from the evidence." *Jammal v. Van de Kamp*, 926 F. 2d 918, 919 (9th Cir. 1991).

Spinks's argument fails under the deferential standard of Section 2254(d)(1); he has not demonstrated the State court's decision was unreasonable under federal law. As an initial matter, the Court does not believe this evidence truly is propensity evidence. It was not presented to show that Spinks was conspiring with others to cause physical harm to Archuleta. Further, as explained by the trial court, there was a permissible inference to be drawn, specifically, the effect that the receipt of the letters from the two inmates had on Archuleta. This evidence, then, was probative of Spinks's intention and motive to harass Archuleta, even in the

face of a valid protective order. Because the jury was free to draw permissible inferences from the evidence, it was relevant and did not violate Spinks's right to due process.

## 2. Claim 2- Due Process Violation/Right to Impartial Jury

Spinks alleges the unwarranted and excessive restraints and security measures imposed by the trial court violated his right to due process and to a fair trial. The trial court observed initially that under Montana law, "a court is authorized to restrain a defendant when it is persuaded by compelling circumstances that the measure is necessary to maintain security in the courtroom and the court must pursue less restrictive means prior to imposing restraints." (Doc. 9-69 at 4-5). The court noted that because the claim was not raised on direct appeal, it was procedurally barred. (*Id*. at 5.) But the court held that even if the claim was not barred, the allegation lodged by Spinks was conclusory and there was nothing, aside from Spinks's own affidavit, to substantiate Spinks's claim that the restraints and security measures materially impacted the trial. (*Id*.) The court went on to find that there was no indication the use of the restraints created a fundamental miscarriage of justice for Spinks. (*Id*.) As set forth above, this finding was summarily adopted by the Montana Supreme Court.

To the extent that Spinks attempts to challenge the Montana courts' application of Montana law, it is not a cognizable claim in this Court. Federal

habeas relief only is available for violations of the Constitution or laws or treaties of the United States.  *See* 28 U.S.C. 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  To the extent, however, that Spinks seeks to challenge the trial court's decision to shackle him under the Federal constitution, the claim is cognizable.

"The Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of discretion, that they are justified by a state interest specific to a particular trial." *Deck v. Missouri*, 544 U.S. 622, 629 (2005).  Before permitting a defendant to be restrained during trial, "due process requires the trial court to engage in an analysis of the security risks posed by the defendant and to consider less restrictive alternatives." *Rhoden v. Rowland*, 172 F. 3d 633, 636 (9th Cir. 1999).  In order for a defendant to prevail on this type of due process claim:

> a court must find that the defendant was indeed physically restrained in the presence of the jury, that the shackling was seen by the jury, and that the physical restraint was not justified by state interests. Then, in order for the unjustified shackling to rise to the level of a constitutional error, the defendant must make a showing that he suffered prejudice as a result.

*Ghent v. Woodford*, 279 F. 3d 1121, 1132 (9th Cir. 2002).

The record reveals that prior to trial, the State apparently proposed two trial security options.  (Doc. 9-1 at 3, doc. seq.  54-55).  The plan itself was filed under seal.  Although the precise security plan proposed by the State is not in the record

before this Court, the contents can be gleaned from a letter sent to Spinks by his

appellate counsel:

> The State filed a security plan with the court on January 3, 2012. Part of the
> plan included two options for restraints: (1) that you be kept in full restraints
> including leg restraints, handcuffs, transport belt and a "Bandit" electronic
> restraint system at all times; or (2) that you wear only the leg restraints and
> Bandit system while in front of the jury. The plan indicated that the Bandit
> was an electro-muscular disruption system that could remotely deliver a
> debilitating shock, but was otherwise invisible under your clothing. The first
> plan required 3 security staff in the courtroom, while the second plan
> required 4. Your [trial] counsel stated you preferred option B.

(Doc. 2-1 at 56.) (internal citations omitted).

At a pretrial hearing, outside the presence of Spinks, Frisbie advised the trial

court that the defense did not objection to security plan B and requested the court

impose that plan at trial. (Doc. 9-43 at 6: 19-20.) During the hearing, the parties

discussed the logistics of the security plan. (Doc. 9-43 at 7-8.) According to

Spinks, he wore a shock boot, shackles (leg restraints), a belly belt, and handcuffs.

*See, e.g.* (Doc. 9-69 at 4; Doc. 1-1 at 5.) It is unclear whether he wore all of these

items during the entire trial; it appears all of these items may have only been worn

during Spinks's transport to and from the courtroom.[3]

A review of the hearing transcript, as well as the trial transcript, reveals this

enhanced plan was deemed necessary, at least in part, because two of the witness

---

[3] In his state postconviction petition, Spinks only references his restraint by a shock boot and excessive law
enforcement presence in the courtroom, not handcuffs and a belly chain. See, (Doc. 9-51 at 9; 53).

testifying against Spinks, Lewis Thorp and William Sandel, were inmates at CCC who had previously been housed with Spinks and there existed ill-will between the men.  Of course, the other witness against Spinks was Archuleta, his ex-wife with whom Spinks shared a tumultuous and destructive relationship.  Archuleta described this relationship as "[t]urbulent, at best."  (Doc. 9-44 at 141.)

The record shows that prior to the testimony of Thorp, the trial court was particularly concerned with the safety of the jurors as well as other individuals in the courtroom.[4]  Thorp was serving a life sentence without the possibility of parole and could generally be deemed a hostile witness.  *See* (Doc. 9-45 at 9- 17.)  Thorp acknowledged there was animosity between him and Spinks.  (*Id*. at 11; 18-19.)  The second witness from CCC, William Sandel, was hostile and uncooperative with the trial proceedings to a greater degree than Thorp.  *See* (*Id*. at 22-34.)  The court dismissed the jury prior to both Thorp and Sandel being escorted from the courtroom.  (*Id*. at 20, 33.)

The only issue raised by defense counsel relative to the security measures

---

[4] Court: Mr. Raph, do you know whether you want- are you going to have the witness seated and then the jury brought up?
Raph:   It's your choice, either way Your Honor, we're going to bring the witness in through this door here.
Court:  Well which is safer; Sheriff?
Sheriff: It would probably be better to bring the witness in first.
Court:  Okay, then' we've got the jury coming in this way?
Sheriff: And we'll have the witness sitting in the chair and we'll have another officer outside…following them in.

(Doc. 9-45 at 6-7).

used on Spinks's person occurred when the court excused the jury pool from the courtroom during voir dire in order to conduct an individual examination with several members. Defense attorney Frisbie advised the court that Spinks's ankle bracelets were causing discomfort: "he says it's hurting him really bad… so maybe the lady could re-adjust it." (Doc. 9-44 at 40: 4-6.) In response, the court directed "whatever needs to be done" be performed to increase Spinks's comfort level. (*Id*. at 40:13-14.) The court then asked Spinks if he was more comfortable after adjustments were made, to which he responded, "[n]ot really, but it's going to have to be." (*Id*. at 40:19-20.) The court then asked the sheriff if that was the best that could be done. (*Id*. at 40:21-22.)

While the jury was excused during this exchange, it appears that one prospective juror, Mr. Browning, may have been in the courtroom. *See* (Doc. 9-44 at 39: 19-21.) Mr. Browning was not selected to serve on the jury. (*Id*. at 91:3-7.) There was no further discussion relative to the discomfort of the cuffs or of the security devices impeding Spinks's ability to participate in the proceedings, nor were any objections lodged during trial. Additionally, when testifying in his own defense, Spinks was allowed to remain at the defense table rather than taking the witness stand, presumably so as not to draw attention to the leg restraints. *See* (Doc. 9-45 at 49:16-20.)

In this case, the basis for the use of the physical restraints can be ascertained

18

from the record. Based upon the record before this Court, it is unclear whether or not the restraints used were ever seen by the jury. *See Ghent*, 279 F. 3d at 1132. Additionally, Spinks has not demonstrated that the decision to use restraints under the circumstances of this case was not justified by state interests. *Id*. Spinks has not established that the state courts' adjudication of this claim was contrary to or involved an unreasonable application of clearly established Supreme Court law. Accordingly, it should be afforded deference.

### 3. Claim 3- Ineffective Assistance of Trial Counsel

Spinks contends trial counsel was ineffective for failing to object to the unwarranted restraints/security during trial. Spinks states that due to the restraints he was unable to meaningfully participate during trial for fear of being electrocuted. According to Spinks, trial counsel's ineffective assistance deprived him of a fair trial and violated his right to due process.

A petitioner asserting ineffective assistance of counsel must show that (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) counsel's errors "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Consequently, Spinks must establish that trial counsel performed deficiently and show that the deficient performance resulted in prejudice to Spinks. When a petitioner claims that his counsel's

performance violated the Sixth Amendment, "[i]n addition to the deference granted to the state court's decision under AEDPA, [federal habeas courts] review ineffective assistance of counsel claims in the deferential light of *Strickland*." *Brown v. Ornoski*, 503 F. 3d 1006, 1011 (9th Cir. 2007); *see also Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (review of a *Strickland* claim pursuant to Section 2254(d)(1) is "doubly deferential.").

The postconviction court held that claims of ineffective assistance of counsel based upon failure to object generally do not serve as that basis for a meritorious IAC claim because the tactical decision of whether or not to object is "a decision of judgment." (Doc. 9-69 at 8) (citing *Dawson v. State*, 2000 MT 219, ¶ 105, 301 Mont. 135, 10 P. 3d 49.) Despite Spinks's characterization of the restraints as "unwarranted," as set forth above, Spinks has failed to establish that the trial court erred with the imposition of the security plan.

Because Spinks's trial counsel consented to security plan B, there would be no basis for trial counsel to then object to the imposition of the plan to which it had previously agreed, absent the plan not being followed. Also, aside from the exchange cited above, relative to the adjustment of Spinks's ankle bracelets, there was no further discussion of the use of restraints or objections to the use of the restraints made during the trial. Likewise, there was no objection made to the presence of the officers or to the shock boot itself. Thus, there is nothing in the

record for this court to determine that counsel performed deficiently or that Spinks was prejudiced as a result of counsel's performance. *Strickland,* 466 U.S. at 687. Given the doubly deferential manner in which this Court is to review the claim, Spinks has not met his burden of establishing that the state court decision was objectively unreasonable. Thus, the claim should be afforded deference.

### 4. Claim 4- Ineffective Assistance of Appellate Counsel

Spinks claims his appellate counsel was ineffective for failing to raise the excessive restraint/security issue on direct appeal. Although this precise claim was not raised in postconviction proceedings,[5] and the merits of the claim were not addressed by the Montana Supreme Court on direct appeal from the denial of the postconviction petition, it is likely procedurally defaulted. It is more efficient, however, to proceed to the merits of the claim. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997).

The Sixth Amendment guarantees the right to effective representation on direct appeal. *See Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). In assessing a claim that counsel's representation did not meet the constitutional minimum, the court is to "indulge in a strong presumption that counsel's conduct f[ell] within the wide range of professional assistance." *Strickland*, 466 U.S. at 689. Effective

---

[5] See, (Doc. 9-69 at 7).

legal assistance does not mean that appellate counsel must appeal every question of law and raise every non-frivolous issue requested by a defendant. *Jones v. Barnes*, 463 U.S. 745, 751-754 (1983). However, appellate counsel's performance must meet prevailing professional norms. *Smith v. Murray*, 477 U.S. 527, 535-36 (1986).

Spinks argues that appellate counsel rendered ineffective assistance by failing to raise a challenge to the use of restraints/security on appeal. First, Spinks must show that appellate counsel's performance was objectively unreasonable, which requires him to demonstrate that counsel acted unreasonably in failing to discover and brief a meritorious issue. *Moorman v. Ryan*, 628 F. 3d 1102, 1106 (9th Cir. 2010). Next, Spinks has the burden of showing prejudice, that is demonstrating a reasonable probability that, but for appellate counsel's failure to raise the restraint/security claim, he would have prevailed in his appeal. *Id*. The Ninth Circuit has discussed the application of *Strickland* to ineffective assistance of appellate counsel claims:

> [t]hese two prongs partially overlap…In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy…Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason-because she declined to raise a weak issue.

*Miller v. Keeney*, 882 F. 2d 1428, 1434 (9ᵗʰ Cir. 1989); *see also Bailey v. Newland*, 263 F. 3d 1022, 1028-29 (9ᵗʰ Cir. 2001). The question for analysis is whether the unraised issue, if raised, would have "led to a reasonable probability of reversal." *Id*. at 1434-35.

Spinks corresponded with his appellate attorney, Nicholas Domitrovich, and outlined all of the issues he wanted addressed on appeal. In a lengthy response, Domitrovich addressed each potential claim and explained why or why not, in his professional estimation, the claim warranted inclusion in the appellate brief. *See* (Doc. 2-1 at 54- 66.) Domitrovich reiterated a prior discussion he had with Spinks and explained that he believed it to be more effective advocacy to argue "a few strong issues" rather than take a "scattershot" approach." (*Id*. at 54.) Domitrovich determined that there were two potentially meritorious issues for direct appeal. (*Id*.)

As referenced above, Domitrovich noted that there was no evidence in the record that the sheriff threatened to shock Spinks if he attempted to participate in the trial. (*Id*. at 63.) Additionally, Domitrovich noted that defense counsel agreed to security plan B and that no subsequent objection was made to security plan, to the presence of the officers, or to the shock book. (*Id*. at 63-64.) While Domitrovich found the issue was not properly preserved for appeal, he explained that he was considering the possibility of using the heavy security as a persuasive

element in the appellate brief relative to the character evidence argument.  (*Id*. at 64.)

Spinks has not established either *Strickland* prong.  Domitrovich outlined the reasons why he would not be including the security/restraint issue in the appellate brief.  Not only was it not properly preserved, he did not deem it to be a strong claim.  This was a proper exercise of his professional judgment; Spinks has not shown that this decision reflected a lack of competence.  Moreover, Spinks has failed to establish that he was prejudiced.  As discussed above, this Court is not persuaded by the restraint claim.  There is no indication that the Montana Supreme Court would have been so moved or that the issue would have probably led to a reversal of Spinks's conviction.  Thus, the claim is lacking in merit.

### 5. Claim 5-Ineffective Assistance of Trial Counsel

Spinks believes trial counsel was ineffective for failing to file a motion for a new trial following the admission of the "fundamentally unfair" information from Spinks' ex-wife during trial.  Spinks contends trial counsel erred in telling Spinks that a motion for a new trial could be filed following the conclusion of direct appeal when, in reality, it should have been filed within 30 days of trial.  This performance, Spinks believes, fell below an objective standard of reasonableness.

The postconviction court found this contention to be unpersuasive because the decision was not ineffective or prejudicial.  First, it noted that Frisbie could

have reasonably determined not to seek a new trial because the motion would be considered frivolous. (Doc. 9-69 at 8.) This rationale was affirmed, according to the postconviction court, when the Montana Supreme Court declined to reverse Spinks's conviction on direct appeal. (*Id.*)

Spinks contends that Frisbie advised him incorrectly about the filing deadline for a motion for a new trial. There is no record of this purported erroneous advice, aside from Spinks's own assertion. Even taking this statement at face value and assuming that this performance was deficient, Spinks has not demonstrated that he was prejudiced. The testimony from Archuleta was deemed admissible, thus, there would have been no basis for granting a new trial, even if one had been timely requested. Further, under the doubly deferential standard of *Strcikland* and the AEDPA, Spinks has failed to meet his burden. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). The state court decision should be afforded deference.

### 6. Claim 6- Ineffective Assistance of Trial Counsel

Spinks alleges trial counsel failed to adequately investigate or present impeachment evidence of Archuleta provided to counsel by Spinks in violation of Spinks' right to effective counsel.

The postconviction court noted that Spinks and counsel felt they were ambushed when the trial court admitted the statement from Archuleta referenced

above regarding Spinks's prior threats. (Doc. 9-69 at 7.) Because of this, trial counsel felt that he was unprepared to counter the testimony. The trial court noted first, that by virtue of this "ambush" Spinks acknowledged that his counsel was incapable of providing the representation that Spinks wished he would have. (*Id*.) Also, the court held that the prior bad act testimony issue had been litigated and rejected on direct appeal; so, there was no meritorious basis for which Spinks to lodge a valid IAC claim relative to the purported failure to investigate. (*Id*.) The Montana Supreme Court agreed that this purported failure to investigate was part of the direct appeal and could not be relitigated. *See* Spinks *v. State*, 2015 MT 206N at ¶ 7.

Spinks had previously been charged with violating protection orders in 2002, 2003, 2005. (Doc. 2-1 at 27.) The 2002 violation did not involve Archuleta but rather a girlfriend Spinks had at the time. (*Id*. at 28.) Spinks estimated he had been charged thirteen times since 2000 with various criminal offenses, eleven of which involved Archuleta. (*Id*. at 41.[6]) Spinks appears to have suggested to Frisbie that during trial they pursue a defense seeking to connect his criminal history to the tumultuous relationship he had with Archuleta in an attempt to

---

[6] Although it is unclear exactly what Spinks was convicted of, charges brought against him involving Archuleta included: partner/family member assault (Doc. 2-1 at 41); disorderly conduct (id.); sexual intercourse without consent (id.); intimidation (id. at 42); assault with a bodily fluid (id.); violation of protection order (id. at 43); violation of protection order (id.); violation of protection order (id. at 44). There was also apparently a revocation of suspended or deferred sentence (id. at 45).

discredit Archuleta. (*Id*. at 45.) Frisbie and the defense investigator explained to Spinks that the trial judge was unlikely to let the information in, that it was precluded by the Montana Rules of Evidence, that Archuleta was the victim in the matter, and that the introduction of such information was likely to be highly prejudicial to Spinks because he had pled guilty to several prior criminal offenses involving Archuleta. (*Id*. at 47-48.) While Spinks may have thought pursuing a line of questioning that involved bringing to light the details of Spinks's and Archuleta's relationship and the criminal charges that stemmed therefrom could be beneficial, the danger of potential prejudice to Spinks from opening this door was apparent. The exact details and trajectory of Spinks's criminal history and turbulent relationship with Archuleta is one that a defense attorney reasonably would not want in front of a jury. Frisbie cannot be faulted for electing to pursue a defense that would have been damaging to his client; doing so very well may have constituted deficient performance.

Additionally, Spinks seems to contend that the only trial testimony that implicated him in violating the permanent order of protection came from Archuleta. Spinks is mistaken. The letter from Thorp that was admitted into evidence stated that Thorp received Archuleta's address from Spinks. *See e.g.* (Doc. 9-45 at 10.) The second letter stated that Sandel received Archuleta's address "from another inmate." (*Id*. at 24.) Testimony was presented that during a

subsequent investigation Sandel claimed that another inmate gave him Archuleta's address, but then Sandel's account of events subsequently changed and Sandel claimed he found Archuleta's address on a bulletin board at CCC. (*Id*. at 28-32.) Sandel was declared unavailable and the trial court allowed the prosecutor to read portions of Sandel's prior interviews back to him while he was on the witness stand. During trial, Thorp testified that in his letter he wrote that he had received Archuleta's address from Spinks and that Spinks said Thorp should write Archuleta. (Doc. 9-45 at 10-11.) While on the stand, Thorp affirmatively testified that he received the address from Spinks[7]. (*Id*. at 11.) Additionally, a piece of paper containing Archuleta's address was admitted into evidence; Spinks had given the paper to Thorp. (*Id*. at 13.) A CCC employee recovered the paper from Thorp during the initial investigation of the matter. (*Id*. at 12.)

Not only has Spinks not met his burden of establishing that the state court decision was contrary to or involved and unreasonable application of federal law, he has not established either deficient performance or prejudice under *Strickland*.

## IV. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules governing § 2254

---

[7] Thorp's trial testimony was: "Mark Twain said it best, you tell the truth you've got nothing to remember. I got the address from that clown right over there, (witness indicating [Spinks]), I hope they string him up." (Doc. 9-45 at 11: 8-11).

Proceedings. A COA should issue as to those claims on which a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Spinks has not made a substantial showing that he was deprived of a constitutional right. There are no close questions and there is no reason to encourage further proceedings. Spinks's claim that his appellate counsel provided ineffective assistance is lacking in merit. The remainder of Spinks's claims do not survive deferential review under the AEDPA. A certificate of appealability should be denied.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1. Mr. Spinks' petition (Doc. 1) should be DENIED for lack of merit.

2. The Clerk of Court should be directed to enter by separate document a judgment in favor of Respondents and against Petitioner.

## NOTICE OF RIGHT TO OBJECT
## TO FINDINGS & RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Mr. Spinks may object to this Findings and Recommendation within 14 days.[8] 28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

Mr. Spinks must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address." Failure to do so may result in dismissal of this case without notice to him.

DATED this 6th day of January 2017.

/s/ John Johnston
John T. Johnston
United States Magistrate Judge

---

[8] As this deadline allows a party to act within 14 days after the Findings and Recommendation is "served," Fed. R. Civ. P. 6(d) applies, and three days are added after the time would otherwise expire.